IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 17, 2015 Session

## STATE OF TENNESSEE v. MICHAEL MULLINS

**Appeal from the Criminal Court for Knox County**
**No. 93800    Mary Beth Leibowitz, Judge**
**G. Scott Green, Judge**

**No. E2015-00270-CCA-R3-CD – Filed April 6, 2016**

The Defendant, Michael Mullins, pleaded guilty in the Knox County Criminal Court to aggravated assault, a Class C felony, and received a three-year sentence. *See* T.C.A. § 39-13-102 (Supp. 2009) (amended 2010, 2011, 2013, 2015).  The trial court granted the Defendant's request for judicial diversion and ordered him to pay more than $8000 in restitution.  After a probation violation report and warrant were filed with the trial court, the court determined that the Defendant violated the conditions of his release, revoked the Defendant's judicial diversion, and sentenced him to three years' enhanced probation.  On appeal, the Defendant contends that (1) because the parties had a plea agreement regarding the disposition of the probation violation, the trial court erred by allowing the State to rescind the agreement and by not providing the Defendant the opportunity to choose between requiring the State to specifically perform the agreement and withdrawing his guilty plea to the probation violation, (2) the trial court's failure to consider his corrective actions during the two years the probation violation proceedings were pending violated his right to a speedy trial, (3) the court erred by holding a judicial diversion revocation proceeding before holding a probation violation proceeding, and (4) the court erred during its restitution determinations.  We affirm the judgment of the trial court and dismiss the Defendant's appeal relative to restitution pursuant to the mootness doctrine.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined.  ROGER A. PAGE, SP. J., not participating.

Margret W. Vinsant (on appeal and revocation hearing) and Stephen McGrath (guilty plea and sentencing hearings), Knoxville, Tennessee, for the appellant, Michael Mullins.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Randall E. Nichols, District Attorney General; and Jo Helm, Jeff Blevins, Eric Counts, and Deborah Malone, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The record reflects that on February 10, 2010, the Defendant pleaded guilty pursuant to a negotiated plea agreement to aggravated assault in exchange for a three-year sentence as a Range I, standard offender with manner of service to be determined by the trial court. At the guilty plea hearing, the Defendant told the court that he understood he was applying for probation and that the court would decide whether he served his sentence on probation. The Defendant understood that his conviction would remain on his criminal history and could be used to enhance any future sentence. The court reviewed the Defendant's constitutional rights, and the Defendant understood he was waiving those rights by pleading guilty.

Upon entering his guilty plea, defense counsel informed the trial court that the State agreed to allow the Defendant to apply for judicial diversion because of the unique circumstances of the case. According to counsel, the victim and his girlfriend were having a domestic altercation when the victim's girlfriend fled the victim's home and ran to the Defendant's home. Counsel stated that the victim was attempting to break into the Defendant's home to continue the domestic assault against the victim's girlfriend when the Defendant assaulted the victim. Counsel noted the victim had an extensive criminal history of assault and domestic assault and was forthcoming about his reasons for being at the Defendant's home. The court instructed the Defendant to discuss the circumstances of the offense during the presentence investigation and reserved judgment until the presentence investigation was complete. A restitution order for $1485.04 was entered at the time of the guilty plea pursuant to the plea agreement.

At the March 24, 2010 sentencing hearing, an extensive discussion was held about increasing the amount of the restitution because Medicare and Medicaid had not paid some of the victim's medical expenses and because the victim required an additional surgery. An amended restitution order was entered reflecting an amount of $6216.31. The order noted that the trial court would determine restitution relative to any additional expenses, including the victim's needed surgery, upon sufficient proof. The court placed the Defendant on judicial diversion because although the Defendant's actions began as lawful, at some point during the altercation, the Defendant realized his conduct became unlawful. The court ordered the Defendant be supervised by a probation officer during the three-year diversion period.

On July 11, 2012, a probation violation warrant was issued on the grounds that the Defendant failed to maintain employment, failed to report to his probation officer, tested positive for marijuana on two occasions, failed to "follow through with" the drug and alcohol assessment, and failed to pay fees, costs, and restitution. The probation officer's affidavit stated the amount of restitution owed was $8086.42, which was the sum of the February 10, 2010 and March 24, 2010 restitution orders, plus a 5% fee paid to the court clerk's office. On July 25, 2012, a revocation proceeding was scheduled but because the prosecutor and defense counsel had scheduling conflicts and a homicide trial was in progress before the trial court, the matter was rescheduled to August 9, 2012. The Defendant remained in confinement pending the August 9 hearing.

On August 9, 2012, the parties agreed to continue the revocation proceedings for ninety days to provide the Defendant an opportunity to "right his ship" in relation to the conditions of his release. The prosecutor told the court that the parties agreed to release the Defendant on his own recognizance. The proceedings were continued to November 18, at which time it was reported that the Defendant had no positive drug screens, had made some payments, and had applied for twenty to thirty jobs. Defense counsel informed the court that pending employment, the Defendant had been providing twenty-four-hour care to an elderly disabled veteran. The veteran's case worker informed counsel the morning of the hearing that the Defendant would begin receiving compensation at the end of November. The proceedings were continued until January 18, 2013, but inclement weather required rescheduling the proceedings to February 4, 2013, at which time the proceedings were rescheduled to May 3, 2013, for an unspecified reason.

On May 3, 2013, defense counsel told the trial court that the Defendant had applied for but was unable to obtain compensation for the care he had provided to the elderly veteran. The Defendant had obtained employment at Taco Bell and would receive his first paycheck on May 8. The probation officer confirmed the Defendant had been reporting and had obtained employment. The proceedings were continued to December 13.

On December 11, 2013, the trial court entered an order amending the probation violation warrant relative to the Defendant's being arrested for driving on a suspended license on November 16, 2013. At the December 13 hearing, the probation officer said that the Defendant had been in compliance with the conditions of his release, except for the driving on a suspended license charge. The court released the Defendant on his own recognizance and noted that the Defendant needed to begin paying a significant amount toward the more than $8000 owed in restitution. Defense counsel noted that the Defendant was employed and hoped to make payments. The proceedings were continued to February 7, 2014.

At the February 7, 2014 hearing, the probation officer told the trial court that the Defendant was reporting to the probation office and was in compliance with the terms of his release. Although the Defendant was not present for the hearing, he had contacted his probation officer that morning when the Defendant's "ride fell though." The court noted that the Defendant was close to paying his court costs but had not made any payments toward restitution. Defense counsel said she was working on restoring the Defendant's driver's license and thought the Defendant's ability to make payments would increase afterward. The proceedings were continued to June 27, but the record reflects no additional proceedings until July 9, 2014.

On July 9, 2014, defense counsel reported to the trial court that the Defendant had been arrested for aggravated assault and vandalism and requested a continuance until after the preliminary hearing was held on the new criminal charges. Counsel told the court that she believed the charges were fabricated in retaliation, although she did not provide further details. The proceedings were continued to August 1, 2014, at which time counsel told the court that the driving on a suspended license charge had been dismissed and that the Defendant had obtained his driver's license. Counsel told the court that the aggravated assault and vandalism charges had been bound over to the grand jury and that the Defendant adamantly disputed the allegations.

Also at the August 1, 2014 hearing, defense counsel told the trial court that the parties had "an agreement that [the Defendant] will submit to the violation of probation and apply for Enhanced" probation. The prosecutor did not comment. Counsel noted for the court that her file showed that on March 24, 2010, the court entered an order for an additional $6216 in restitution but that she did not have records supporting it. The court noted that counsel and the prosecutor could discuss the restitution and address any concerns at the next hearing, which was scheduled for September 12, 2014. The trial judge noted that as a result of her retirement, a subsequent judge would preside over the case in September. The August 1, 2014 court minutes state that the Defendant submitted to the probation violation warrant and was referred to the enhanced probation program for an evaluation and report.

On September 12, 2014, defense counsel informed the subsequent trial judge that the Defendant had been evaluated for purposes of determining whether the Defendant was a suitable candidate for enhanced probation and that if enhanced probation accepted him, he would "submit" to the probation violation and serve the remainder of his time on probation. The trial court asked if the Defendant had submitted to the probation violation, and counsel said the Defendant had not. The prosecutor, though, said the Defendant submitted to the "revocation" on August 1, and counsel ultimately agreed and said the only remaining issue was whether enhanced probation would accept the Defendant. We note that a subsequent prosecutor began representing the State at the September 12 hearing.

The subsequent prosecutor requested that the disposition of the probation violation be continued until a disposition was obtained relative to the aggravated assault and vandalism charges. Defense counsel objected to the delay because the Defendant had been in custody for two months at the time of the hearing and told the court that the charges were false, that the matters would not be resolved by a plea agreement, and that defending the charges would take an unknown amount of time. The court, though, expressed concern about placing the Defendant on enhanced probation without knowing the disposition of another aggravated assault charge. Counsel told the judge that "we agreed last time that he would submit and we would see if Enhanced would accept him." Counsel said that the prosecutor present at the previous hearing was aware of the pending aggravated assault and vandalism charges and argued that the State should not be permitted to object to placing the Defendant on enhanced probation for the remainder of his sentence. The court asked if the State agreed to place the Defendant on enhanced probation if eligible, and counsel said this was her understanding. The prosecutor, though, said her file did not reflect an agreement. The prosecutor said her file showed that the Defendant submitted to the probation violation, that he would apply for enhanced probation, and that he was attempting to maintain judicial diversion.

Upon further discussion, the prosecutor stated, "Your Honor, if that's the case, fine we'll set aside the submission. Let's set it for hearing, I'll subpoena witnesses. I mean, I think it's inappropriate to release him when he's got an aggravated assault and vandalism pending . . . when he's on diversion [for aggravated assault]." The court replied, "I'm not going to hold you to this, General, but what do think a realistic time would be for that case to come out of the grand jury?" The prosecutor did not know the time frame. The probation officer present at the hearing agreed with the prosecutor that the Defendant should be held in confinement pending the resolution of the new charges. The court ordered the Defendant to remain in custody.

Relative to the amount of restitution, defense counsel told the trial court that at the previous hearing, the defense raised an issue about the amount of restitution and the lack of documentation supporting it. Counsel said the State was going to provide the court with proof of the $6000 added after the Defendant entered his guilty plea. The prosecutor said the restitution orders were entered in 2010 and argued the Defendant's opportunity to contest the amount had expired. The court told counsel to file a written motion challenging the amount.

The trial court asked the prosecutor to contact the prosecutor present at the August 1 hearing to determine if he had agreed the Defendant would be placed on enhanced probation if accepted into the program. The court noted the probation officer's report showed the Defendant was appropriate for enhanced probation. The court stated, "[T]hat's my decision on whether or not he gets placed on Enhanced, but that's changed somewhat, if, in fact, there was an agreement between the State and the Defendant." The proceedings were continued

one week with instructions for the prosecutor and counsel to discuss whether an agreement existed with the prosecutor present at the August 1 hearing.

On September 19, 2014, defense counsel told the trial court that she spoke with the previous prosecutor, who said he could not recall what occurred at the August 1 hearing without looking at the file. The previous prosecutor told counsel that his "personal stance . . . based upon what the [previous] judge would regularly do in these types of matters was leave it up to probation." Counsel explained that if probation agreed to accept a defendant, the prosecutor would not object and that the judge would usually place a defendant on probation. The court noted that a judge's routine practice was not equivalent to an agreement between the parties and that the disposition of the probation violation would be for the court to determine. Counsel stated that if the court found no agreement existed, the Defendant wanted the opportunity to withdraw his submission to the probation violation.

The subsequent prosecutor told the trial court that she had also spoken with the previous prosecutor, who told her that his position was to "stack" the new charges on the original charges if enhanced probation accepted the Defendant. The prosecutor agreed that if the Defendant submitted to the probation violation because he thought he would receive enhanced probation, the Defendant should be allowed to withdraw his submission. Counsel agreed and said she wanted to present "full proof" because the probation violation had been pending for two and one-half years. The court stated that it would resolve the probation violation if counsel wanted but that it preferred to consider all the evidence at a hearing. The trial court said the following:

> Why don't we do this? Here's the simple solution for everybody. If the General has already said that she's willing to allow him to withdraw his submission, let's set this for a revocation hearing. You're going to get some free discovery on those new charges. Set it for a revocation hearing two weeks out. General, get the witnesses here on that new case. I'll hear the proof, and if it's as bogus as what you and Mr. Mullins believe it to be, if I find no merit to that basis of the – it'll make the Court's mind rest a whole lot easier if there's no merit to the new aggravated assault if I'm going to be placing him on some form of alternative sentencing.

None of the parties objected, and the revocation hearing was scheduled for October 24, 2014. The court noted that if it found after a hearing that a "reasonable material" basis existed to believe the Defendant committed the new offenses in addition to the technical violations, it would enter an order finding that the Defendant violated the conditions of his probation. The court minutes reflect that the parties agreed to allow the Defendant to withdraw his submission to the probation violation.

On October 20, 2014, the Defendant filed a motion requesting a hearing to modify the amount of restitution to $900, or alternatively, in an amount not to exceed $1485.04.

At the October 24, 2014 probation revocation hearing, Probation Officer Dwight Brown testified that he had supervised the Defendant's release since October 2010, and that the Defendant's compliance had been "shaky at best." Mr. Brown noted that the Defendant previously admitted using illegal narcotics twice and that the Defendant failed to comply with an action plan created by the administrative case review committee, although Mr. Brown and the Defendant signed a form acknowledging the plan had been explained to the Defendant. Mr. Brown said the Defendant had been employed during the majority of his supervision but had not made monthly payments toward costs and fees.

Mr. Brown testified that a probation violation warrant was issued in July 2012 and that it alleged the Defendant had failed drug screens and failed to comply with the administrative case review committee's plan. The Defendant was returned to probation on August 9, 2012. Mr. Brown said the probation violation warrant was subsequently amended to include the Defendant's driving on a suspended license charge, and Mr. Brown thought the Defendant told him about the charge. Mr. Brown said the Defendant was returned to probation on December 13, 2013. Mr. Brown said the Defendant reported routinely until March 2014, and Mr. Brown noted the Defendant failed to report on March 8, March 18, and June 3.

Mr. Brown testified that the probation violation warrant was amended again when the Defendant was arrested for aggravated assault and vandalism and that the Defendant did not inform him of the charges. Mr. Brown stated that as a probation officer, he had nothing remaining to offer the Defendant.

On cross-examination, Mr. Brown testified that although the Defendant was unemployed for a period of time, the Defendant provided full-time care to an elderly disabled veteran for which he did not receive compensation. He agreed the Defendant's subsequent employment paid minimum wage. Mr. Brown said that although the Defendant failed to report to his office on a few occasions, Mr. Brown could reach the Defendant by telephone or a home visit. Although Mr. Brown could not recall the reasons the Defendant failed to report, Mr. Brown thought it was possible the Defendant's absences were work-related. Mr. Brown said his practice was to reschedule appointments if a probationer had a work-related conflict.

Mr. Brown testified that the Defendant made small and infrequent payments toward costs and fees. Mr. Brown agreed that the Defendant had not failed a drug screen since 2012. Mr. Brown agreed the Defendant was treated for depression but did not know the status of the Defendant's mental health at the time of the hearing. Relative to the Defendant's not

reporting the aggravated assault and vandalism charges, Mr. Brown conceded the Defendant might have been in custody. Mr. Brown said that the driving on a suspended license charge was dismissed and that the Defendant's driving privileges were reinstated before his arrest on the aggravated assault and vandalism charges.

Courtney Linebarger testified that on June 13, 2014, she and the Defendant were roommates, although she had found another place to live. She said the Defendant was unhappy she was moving out because the Defendant would have been responsible for all of the monthly rent. She said that her truck's water pump broke, that she asked to borrow the Defendant's tools to repair her truck, and that she asked for his assistance. She said that the Defendant screamed at her, that she screamed at the Defendant, and that the Defendant "took a blowtorch" to the alternator she was going to reinstall after the repairs to the water pump were completed. She said that she asked the Defendant why he damaged the alternator and that the Defendant smacked her on the left side of her face. She said she immediately called the police. Ms. Linebarger said that the Defendant went inside the home, that he changed his clothes and "grabbed" his dog, and that he said he would kill her if she were there when he returned.

Ms. Linebarger testified that she and the Defendant had separate bedrooms on the main level of the home and that the Defendant's grandmother and uncle lived upstairs. She said that she, Christian Irwin, and Ms. Irwin's husband returned to the home to determine if they could repair Ms. Linebarger's truck. Ms. Linebarger said that the Defendant returned in his car and attempted to run over her and Ms. Irwin with his car. Ms. Linebarger said his car came within one foot of striking her. She said the Defendant leaned out of the driver's side window and threatened to kill them if they did not leave. She said she was on the telephone with the police before the Defendant left again. She said nobody else was at the house at the time of the incidents. She said she was "deathly afraid" of the Defendant because she knew what he was capable of doing.

On cross-examination, Ms. Linebarger testified that the Defendant did not earn enough money to pay all of the monthly rent. She was not employed at the time of the incidents but received child support payments for her one-year-old daughter and four-year-old son, although the children lived with Ms. Linebarger's mother. Ms. Linebarger said that when she asked the Defendant to help repair her truck, the Defendant was sitting in a swing and using his cell phone. She said the Defendant had the blowtorch with him while sitting on the swing. She said that the Defendant got up from the swing, grabbed the alternator, returned to the swing, and used the blowtorch on the alternator. She said that the Defendant left the alternator near the swing and that she picked it up and placed it where the police later found it.

Ms. Linebarger testified that after the Defendant smacked her, he left because the Defendant knew she was going to call the police. She said she told the Defendant if he placed his hands on her again, she would call the police. She said that Ms. Irwin's husband was a mechanic by trade, although he was standing at the Irwin van with the Irwin children when the Defendant attempted to run over her. Ms. Linebarger said Ms. Irwin was helping her remove the parts from the front of the truck and place them in the cab of the truck.

Ms. Linebarger identified a photograph of the home, driveway, and surrounding yard. She said that tire tracks were in the grass to the left of the driveway but that the tracks were not caused by vehicles because nobody was allowed to drive on the grass. She said the tracks might have been caused by a lawnmower. She identified the location of her truck in the driveway on the day of the incident and said the Defendant usually parked his car behind her truck. Although she denied her truck was parked in the middle of the driveway, she conceded it was not parked on the "far right side." She said only she and the Defendant parked their vehicles in the driveway. She said that on the day of the incident, the Defendant "swerved in to the right."

Ms. Linebarger testified that her daughter was one year old at the time of the incident and that Ms. Linebarger and the Defendant had lived together periodically for about eleven months at the time of the incident. She said that she and the Defendant began a romantic relationship when her daughter was three months old. She said that when she was not living with the Defendant, she stayed at Ms. Irwin's home.

Upon questioning by the trial court, Ms. Linebarger testified that the Defendant did not receive any mental health treatment during the time she lived with him. She said, though, the Defendant had anger management problems.

Christian Irwin testified that she knew the Defendant through Ms. Linebarger and that she had known Ms. Linebarger about three or four months at the time of the incident. She said that on the day of the incident, she received a telephone call from Ms. Linebarger requesting Ms. Irwin pick her up because the Defendant had slapped Ms. Linebarger. Ms. Irwin, her husband, their children, and her brother drove to pick up Ms. Linebarger. Ms. Irwin saw that Ms. Linebarger's face was swollen when they arrived. Ms. Irwin said her husband examined the truck while she and Ms. Linebarger stood on the driver's side of the truck. Ms. Irwin said that the Defendant arrived and that he drove past where she and Ms. Linebarger were standing, missing them by one foot. Ms. Irwin said she was scared because the Defendant had made previous threats. Ms. Irwin said the Defendant got out of his car, asked Ms. Linebarger why Ms. Irwin was there, and told everyone to leave. She said the Defendant let his dog outside and left in his car.

On cross-examination, Ms. Irwin said her husband and brother were standing on the passenger side of the truck when the Defendant drove past the driver's side. She said her husband and brother did not say anything after the Defendant drove past her and Ms. Linebarger. She said that the hood was raised when the Defendant drove past the driver's side and that she and Ms. Linebarger jumped onto the truck at the engine compartment. She said Ms. Linebarger stayed at her and her husband's home regularly.

Ms. Irwin testified that her husband attended high school with the Defendant. She said that on the day of the incident, a man was inside the Defendant's car, although she did not know his name. She said that after they left the home, she did not return to help Ms. Linebarger repair the truck. She said another friend helped Ms. Linebarger. She said Ms. Linebarger's face was red when she arrived.

Tonya Mullins, the Defendant's mother, testified that although she was not aware of any recent mental health treatment for the Defendant's depression, she knew the Defendant had obtained treatment from a mental health facility while the Defendant had been on probation. She said the Defendant stayed at the facility for a few days because the Defendant had been depressed and ingested pills. She said the crisis center at a hospital referred the Defendant to the mental health facility. She recalled one other incident in which the Defendant obtained mental health treatment because of his depression and noted the incident occurred about one year before he was hospitalized at the mental health facility. She said the Defendant was diagnosed with bipolar disorder and sought treatment.

Ms. Mullins testified that the Defendant became severely depressed near the time of the incident for which he received judicial diversion, but she could not recall if the depression was immediately before or after the incident. She did not think the Defendant was a danger to the community. She said relative to the incident with Ms. Linebarger that the Defendant did not strike Ms. Linebarger. Ms. Mullins said that the Defendant always admitted to his mistakes and that he had never struck a woman, although Ms. Mullins had seen Ms. Linebarger strike the Defendant.

Upon questioning by the trial court, Ms. Mullins testified she was not present the day of the incident. She agreed the Defendant was excessive in defending his grandmother's friend during the incident for which he received judicial diversion but denied the Defendant had issues with his temper. She said she had not noticed any particular factor that triggered the Defendant's bipolar-related mood swings.

Ms. Mullins testified that the Defendant had a habit of protecting women. She said she was familiar with the Defendant's home and where the residents parked their vehicles. She said that although she could not say Ms. Linebarger parked her truck in the same place

every day, Ms. Linebarger parked in the driveway. Ms. Mullins said that the Defendant drove his car in the grass to get around the truck and that he parked his car in front of the truck. Relative to the tire tracks in the photograph identified by Ms. Linebarger, Ms. Mullins said nobody who lived in the home owned a riding lawnmower. Ms. Mullins said she believed the tire tracks were caused by a car.

Ms. Mullins testified that if the Defendant were released, he would live with her and that she would assist him with his transportation to his appointments. She said she would also help the Defendant comply with the terms of his release and with paying court costs, fees, and restitution. She did not think the Defendant would commit future crimes if he were returned to probation.

On cross-examination, Ms. Mullins testified that she did not think the Defendant was capable of breaking someone's jaw, although he broke the victim's jaw in the underlying aggravated assault.

The trial court asked Ms. Mullins what it should do with the Defendant. Ms. Mullins said relative to Ms. Linebarger that the Defendant was innocent. Relative to the probation violation, she thought the Defendant had learned from "those offenses." She said that the Defendant would live with her, that she would help him calculate a payment plan, and that she would monitor his activities.

The trial court credited the testimony of Ms. Linebarger and Ms. Irwin and found that although it was unclear whether the Defendant intended to "come near them with a motor vehicle," the uncontradicted evidence showed that the Defendant assaulted Ms. Linebarger. The court characterized the Defendant's probation compliance record as "spotty" to "just downright bad." The court found that the Defendant violated the conditions of his probation, revoked his judicial diversion, and entered a judgment of conviction for aggravated assault. The court, though, refused to order the Defendant to serve his sentence in confinement. The court said that when it listened to the Defendant's mother, the Defendant appeared to be "a gentle giant." The court said, though, that the evidence showed the Defendant had an explosive temper, which coupled with the Defendant's strength and size created a dangerous combination.

The trial court explained that it attempted to learn about the Defendant's mental health history during the hearing and that it wanted additional information. The court wanted to review the Defendant's mental health records from the mental health facility and ordered the Defendant undergo a mental health evaluation while remaining in confinement. The court stated that the Defendant did not need to serve his time in the penitentiary but that the Defendant could not hurt anyone when he became angry. The court requested defense

counsel obtain the Defendant's previous mental health records. The hearing was continued for two weeks, at which time the court said it would also address the Defendant's motion regarding restitution.

At the November 7, 2014 hearing, defense counsel provided the trial court with an incomplete copy of the Defendant's mental health records and told the court that she had not yet received all of them. Counsel told the court the records she provided showed that the Defendant had multiple admittances to various hospitals. She said that anytime the Defendant felt extremely depressed or had mood swings, he sought the appropriate care at a hospital or mental health facility. Counsel had records for three periods of treatment for bipolar disorder, and during one period, the evaluators noted the Defendant might have had an intermittent explosive disorder. The records generally noted fluctuating levels of narcotics and alcohol dependence. Counsel said the recurring diagnosis and treatment was for bipolar disorder with a tendency in his mood swings toward depression.

The parties and the trial court had an extensive discussion about coordinating a mental health evaluation because the Defendant had not yet been evaluated. The hearing was continued for one week to provide additional time for the Defendant to undergo an evaluation and for the evaluator to submit a report. The court told the Defendant that it would have been easy to order the Defendant to serve his sentence in confinement but that the court was not going to do that. The court said it wanted to give the Defendant the opportunity for release but had to feel comfortable about releasing him. The Defendant told the court he appreciated the court's leniency and giving him the opportunity for release. The Defendant also told the court he would prove to the court that it had not made a poor decision. The court held the motion regarding restitution in abeyance until the next hearing.

On November 14, 2014, the prosecutor was absent due to an illness. Defense counsel informed the trial court that the Defendant had undergone the initial evaluation but that counsel had not yet received the report. The court agreed to enter an order for the production of the report and the information upon which the evaluator relied. Counsel also told the court that the Defendant still needed to undergo a second portion of the evaluation but that a waiting list existed. The Defendant requested the court consider releasing him in order to obtain the needed evaluation and told the court he would be able to obtain the evaluation much faster out of jail. The Defendant offered to wear a GPS tracking device. The court said that it was willing to consider the motion but only when the prosecutor was present. The proceedings were continued to November 20, 2014.

On November 20, 2014, defense counsel told the trial court that the timeline for the second portion of the evaluation was one month and requested the Defendant's release pending the outcome of the evaluation. Counsel had not received all of the Defendant's

mental health records, and the court said it was going give the Defendant "one more shot to get all those records" for the court's review. The proceedings were continued to December 1, 2014, and the court stated that it would release the Defendant from custody with the conditions that he remain at his mother's home and that he wear a GPS monitoring device at the December 1 hearing.

On November 24, 2014, defense counsel filed a notice of appeal relative to the trial court's revoking the Defendant's judicial diversion and entering a judgment of conviction for aggravated assault.

On December 1, 2014, the trial court stated that it had received the Defendant's mental health records. Defense counsel noted that the second portion of the mental health evaluation was complete and that Ashley Hollander, the criminal justice mental health liaison at the Helen Ross McNabb Center, was present to testify about her treatment recommendations.

Ashley Hollander testified that she evaluated the Defendant and that the Defendant was doing well on his current medications. Ms. Hollander said she did not have any concerns about the Defendant's release from confinement and noted the Defendant had met with several Helen Ross McNabb staff members. Ms. Hollander said that the Defendant was stable on his medications, as reflected by his behavior, and that the Defendant was willing to continue the medications. Although Ms. Hollander had not spoken with the Defendant's mother, Ms. Hollander was willing to coordinate the Defendant's care with his mother.

The trial court ordered the Defendant to serve his sentence on enhanced probation with the initial conditions that he wear a GPS monitoring device and remain at his mother's home unless meeting with his attorney, appearing in court, or obtaining medical treatment. Relative to the Defendant's ability to leave his mother's home to seek and obtain employment, the court said that it wanted the Defendant to take "baby steps" in adjusting to the conditions of enhanced probation and living with his mother. According to the judgment entered on December 2, 2014, the restitution motion was held in abeyance until a "future date." The court minutes reflect that the next hearing was held on January 29, 2015, at which time the Defendant was released from house arrest but ordered to comply with a 6:00 p.m. curfew. The record does not reflect any additional proceedings. This appeal followed.

## I. The Alleged Agreement

The Defendant contends that on July 9, 2014, the parties entered into a negotiated "plea agreement" disposing of the probation violation. He argues that he agreed to plead guilty to violating the conditions of his probation in exchange for his continued judicial

diversion to be served on enhanced probation. In a related issue, he contends that the trial court should have provided him the choice to require specific performance of the agreement or to withdraw his submission to the probation violation. The State responds that no agreement existed regarding the resolution of the probation violation, that the Defendant's not contesting the allegations of the probation violation is distinct from a plea agreement, and that plea agreements are not relevant for purposes of probation violation proceedings. The State claims that because no agreement existed, nothing existed to specifically perform and that no evidence reflects the trial court accepted any agreement.

The record reflects that in 2010, the Defendant pleaded guilty to aggravated assault and received a three-year sentence. The trial court granted the Defendant's request for judicial diversion, placed him on probation for the duration of the three years, and deferred entering a judgment of conviction. On July 11, 2012, a probation violation warrant was filed, but the revocation proceedings were continued for an extensive period of time to provide the Defendant the opportunity to "right his ship." The record reflects that while the revocation proceedings were pending, an amended probation violation warrant was filed on December 11, 2013, as a result of the driving on a suspended license charge. Again, the revocation proceedings were continued for an extensive period of time.

On July 9, 2014, defense counsel told the trial court that the Defendant had been arrested for aggravated assault and vandalism, and the court granted the Defendant's request for a continuance pending the resolution of the preliminary hearing relative to the new criminal charges. On August 1, 2014, the following exchange occurred:

THE COURT: Mr. Mullins has some new warrants.

[DEFENSE COUNSEL]: He does, your Honor, and . . . as far as the aggravated assault and vandalism, those have been bound over to the grand jury; however, he still intends . . . to dispute those adamantly. And we have an agreement that he will submit to the violation of probation and apply for [enhanced probation].

THE COURT: We certainly had technical violations for which he can be . . . submitting. And so he's going to apply to [enhanced probation]?

[DEFENSE COUNSEL]: Yes, your honor.

THE COURT: And this was an aggravated assault so he's probably not eligible to apply for [community corrections].
[THE PROSECUTOR]: No, your honor, and he picked up the new charges.

-14-

THE COURT: Okay, So they're going to need some period of time. Will September 11th or 12th work for you?

The parties agreed to continue the proceedings to September 12 in order for the Defendant to undergo an evaluation to determine if he was an acceptable candidate for enhanced probation. The August 1 court minutes only reflect that the Defendant submitted to the probation violation and was referred to the enhanced probation program for an evaluation and report.

When court reconvened on September 12, a subsequent prosecutor represented the State, and the subsequent trial court judge presided over the case. The prosecutor denied an agreement existed relative to the probation violation and said her file reflected that the Defendant submitted to the violation at the previous hearing, that he requested enhanced probation, and that he was attempting to maintain his judicial diversion. The court continued the case with instructions for defense counsel and the prosecutor to speak with the prosecutor present at the August 1 hearing to determine if the State agreed the Defendant would maintain judicial diversion and be placed on enhanced probation if accepted into the program.

On September 19, the subsequent prosecutor told the trial court that the previous prosecutor's "personal stance . . . based upon what the [previous] judge would regularly do in these types of matters was leave it up to probation." Defense counsel explained that generally the State did not object to probation and that the previous judge would place a defendant on probation. The prosecutor, though, stated that the previous prosecutor said his position was to "stack" the new charges onto the original charge if enhanced probation accepted the Defendant. The prosecutor told the court that the Defendant should be permitted to withdraw his submission to the probation violation if he thought he would receive enhanced probation. When the trial judge permitted the Defendant to withdraw his submission and scheduled a probation violation hearing, neither the prosecutor nor defense counsel objected.

The record fails to reflect that the parties agreed the Defendant would maintain judicial diversion and receive enhanced probation if accepted into the program. The August 1 hearing transcript and trial court minutes reflect that the Defendant submitted to the probation violation and would apply for enhanced probation. The record does not reflect that the Defendant would receive enhanced probation and maintain judicial diversion if accepted by the enhanced probation program. The record also does not reflect what would occur if the Defendant were not approved for the enhanced probation program. We note that judicial diversion was never discussed by the parties or the trial court on August 1 and that the record does not reflect an agreement was accepted or rejected by the trial court. Although counsel

conceded at oral argument that perhaps the details of an agreement were not placed on the record adequately because of counsel and the prosecutor's familiarity with each other and with the trial court's general policy in similar cases, no evidence exists in the record that an agreement was reached regarding the resolution of the probation violation.

Furthermore, when the subsequent trial judge continued the proceedings to allow defense counsel and the subsequent prosecutor to investigate what occurred at the August 1 hearing, no evidence was presented regarding any agreement when court reconvened on September 19. Although counsel believed the previous prosecutor agreed to allow the Defendant to serve his sentence on enhanced probation and maintain judicial diversion, the subsequent prosecutor told the trial court that the previous prosecutor's position was to "stack" the new charges onto the original charge if the Defendant were accepted by the enhanced probation program. We note that the previous prosecutor was not present on September 19 to inform the trial court what he believed transpired at the August 1 hearing and that the transcript of the August 1 hearing was not presented for the trial court's review. This court cannot conclude an agreement existed regarding the resolution of the probation violation without evidence in the record reflecting an agreement. Because the record does not reflect the existence of an agreement between the State and the Defendant, we concluded that the trial court did not err by finding that no agreement existed. In the absence of an agreement, the court could not have permitted the State to rescind something that did not exist or provide the Defendant an opportunity to choose between specific performance and withdrawing his submission to the probation violation. In any event, the trial court properly permitted the Defendant to withdraw his submission to the probation violation because he mistakenly believed an agreement existed.

## II. Violation of Right to a Speedy Trial

The Defendant contends that the trial court violated his right to a speedy trial by refusing to consider at the revocation hearing his corrective actions during the two-year period the probation violation warrant remained pending. He argues that he agreed to extensive delays in the proceedings based upon the original trial judge's representations that it was affording him the opportunity to "cure the violations" but that the trial court refused to consider his corrective actions in determining whether to revoke his judicial diversion, and as a result, the two-year delay violated his right to speedy trial. The State responds that the Defendant's right to a speedy trial was not violated because he agreed to the numerous continuances in an effort to correct the probation violations.

The United States and Tennessee Constitutions guarantee a criminal defendant the right to a speedy trial. U.S. Const. amend. VI; Tenn. Const. art. 1, § 9. In addition, the right to a speedy trial is guaranteed by statute in Tennessee. *See* T.C.A. § 40-14-101 (2012).

Relative to probation revocation proceedings, our supreme court has concluded that such a proceeding "is a continuation of the criminal prosecution, and as such, [a] defendant . . . has a constitutional right to a speedy trial[.]" *Allen v. State,* 505 S.W.2d 715, 719 (Tenn. 1974); *see Blackwell v. State*, 546 S.W.2d 828, 830 (Tenn. Crim. App. 1976). The purpose of the right to a speedy trial is to protect a defendant from harm caused by "oppressive pretrial incarceration, anxiety and concern . . . , and the possibility that the accused's defense will be impaired by dimming memories and loss of exculpatory evidence." *Doggett v. U.S.*, 505 U.S. 647, 654 (1992) (internal quotations marks and citations omitted); *see State v. Utley*, 956 S.W.2d 489, 492 (Tenn. 1997). In determining whether a defendant's right to a speedy trial has been violated, this court considers the length and reasons for the delay, whether a defendant asserted the right, and whether a defendant was prejudiced by the delay. *State v. Bishop*, 493 S.W.2d 81, 83-84 (Tenn. 1973); *see Barker v. Wingo*, 407 U.S. 514 (1972).

The record reflects relative to the length of the delay that the original probation violation warrant was issued on July 11, 2012, and that the probation violation warrant remained pending until October 24, 2014. The two-year, three-month delay is sufficient to trigger a further inquiry and to apply a balancing test of the remaining factors to determine whether the Defendant was denied his right to a speedy trial. *See Doggett*, 505 U.S. at 652; *see also Utley*, 956 S.W.2d at 494. We note, though, that although the length of the delay may support a defendant's claim that he was denied a speedy trial, "this fact alone will [not] support a finding that [a] defendant has been denied his constitutional right to a speedy trial." *Bishop*, 493 S.W.2d at 84.

Relative to the second factor, our courts recognize four categories of reasons for delays. Delays can be "intentional . . . to gain a tactical advantage over the defense or . . . designed to harass the defendant." *State v. Wood*, 924 S.W.2d 342, 346 (Tenn. 1996). Delays can also result from "bureaucratic indifference or negligence." *Id.* at 346-47. Delays can also be "necessary to the fair and effective prosecution of the case," which results in a "justifiable" delay not weighed against the prosecution or a defendant. *Id*. at 347. Finally, a defendant can "cause[], or acquiesce[] in," delays, which is weighed against a defendant. *Id*.

The Defendant argues that the reason for the delay was to "allow [him] an opportunity to take corrective action and keep his judicial diversion." The State responds that the Defendant acquiesced in or the caused the delays in an effort to correct the conduct leading to the probation violation warrants. The record reflects numerous continuances after the probation violation warrant was filed on July 11, 2012. However, the record reflects that the continuances were agreed upon by the parties for multiple reasons. The proceedings were initially continued for the Defendant's benefit to provide him an opportunity to "right his ship." We note that the allegations in the initial probation violation warrant from July 11, 2012, were testing positive for marijuana on two occasions, failure to report to his probation

officer, failure to maintain employment, failure to comply with the drug and alcohol assessment, and failure to pay costs, fees, and restitution. Although the Defendant made progress in satisfying the conditions of his probation and in correcting his behavior between August 9, 2012, and December 13, 2013, the Defendant had difficulty finding employment and making restitution payments. We note that the probation violation warrant was amended on December 11, 2013, because the Defendant was arrested for driving on a suspended license, although the charge was ultimately dismissed. By February 7, 2014, the Defendant was in compliance with the terms of his release but had not made restitution payments. Although no explanation exists in the appellate record, no additional proceedings were held until July 9, 2014. We infer the gap between court appearances was to allow the Defendant time to make restitution payments and to continue complying with the terms of his release. We note that the Defendant did not object to any of the continuances.

Although the Defendant made progress in complying with the conditions of his probation between July 11, 2012, and July 9, 2014, the Defendant was arrested for aggravated assault and vandalism. The Defendant requested a continuance on July 9 until a preliminary hearing could be held on the new charges. At the next appearance on August 1, the Defendant submitted to the probation violation and applied for acceptance into the enhanced probation program. We conclude that the Defendant acquiesced in the delay in the probation violation proceedings between July 11, 2012, and August 1, 2014. The record shows that the continuances were granted and agreed to by the parties in an effort to benefit the Defendant.

Relative to the delays between September 12, 2014, when the subsequent trial judge assumed the case, and October 24, 2014, when the trial court determined the Defendant had violated the conditions of his probation and revoked the Defendant's judicial diversion, the record reflects that the delays were to determine what, if any, agreement was made during the August 1 hearing and whether the Defendant would be permitted to withdraw his submission to the probation violation in the event no agreement existed. As a result, we conclude that the Defendant acquiesced in the delay between September and October 2014 and that the delay was necessary to the fair and effective prosecution of the case because the subsequent trial judge needed to verify whether an agreement existed.

Relative to the third factor, the Defendant contends that he asserted his right to a speedy trial at the September 2014 hearing. The record reflects that after a lengthy discussion about whether an agreement was reached at the August 1 hearing, the prosecutor told the trial court that the Defendant should be permitted to withdraw his submission to the probation violation because he believed he would receive enhanced probation and be allowed to remain on judicial diversion. Defense counsel agreed and said she wanted to present "full proof" because the probation violation had been pending for more than two years.

The Defendant argues on appeal that defense counsel's request to present evidence was an assertion of his right to a speedy trial. The trial court told counsel that it would resolve the probation violation but that it preferred to consider all the evidence at an evidentiary hearing. Counsel responded, "Okay." The court scheduled an evidentiary hearing for October 24, and told the prosecutor to present witnesses regarding the aggravated assault and vandalism charges. Neither the prosecutor nor the defense objected to the court's determination.

We conclude that although defense counsel did not file a written motion asserting the Defendant's right to a speedy trial or make a verbal motion using the specific language right to a speedy trial, counsel's request that she be permitted to present full proof was nonetheless an implied assertion of the right. This factor is weighed in favor of the Defendant. *See Farr v. State*, 506 S.W.2d 811, 814 (Tenn. Crim. App. 1974); *Bishop*, 493 S.W.2d at 84. We note that although the Defendant did not assert his right during the time the probation violation warrant was pending, "the absence of a demand for a speedy trial does not amount to a waiver" of the right. *Bishop*, 493 S.W.2d at 84. In any event, after the Defendant asserted his right in September, the probation violation was resolved the following month.

Relative to the fourth and most important factor, our supreme court has stated that prejudice to a defendant is viewed in light of three distinct interests: (1) to "prevent undue and oppressive incarceration prior to trial," (2) to "minimize [the] anxiety and concern accompanying public accusation," and (3) to "limit the possibilities that long delay impairs the ability of the accused to defend himself." *Bishop*, 493 S.W.2d at 85. Our supreme court has stated, though, that "[c]ourts do not necessarily require a defendant to affirmatively prove particularized prejudice." *State v. Simmons*, 54 S.W.3d 755, 760 (Tenn. 2001).

The Defendant argues in his brief that he was "prejudiced by the trial court's refusal to consider the progress and improvements [he] had made over the past two years, because the trial court considered each issue that occurred but not the curative actions taken in response." The Defendant's argument focuses on the trial court's alleged failure to consider certain aspects of the Defendant's conduct in determining whether he violated the conditions of his probation and whether to revoke judicial diversion, rather than the interests espoused by our supreme court. The record does not reflect that the delay created undue and oppressive incarceration, maximized the Defendant's anxiety and concern beyond that generally associated with being a defendant in a criminal proceeding, or impaired the Defendant's ability to present a defense. We note relative to the Defendant's incarceration that he was released on his own recognizance twice before being arrested for aggravated assault and vandalism in mid-2014. We likewise note relative to the ability to present a defense that many of the delays benefitted the Defendant's ability to present a defense, most notably additional time to show he could comply with the terms of his probation and to obtain his

mental health records and a mental health evaluation. After balancing the four factors, we conclude that the Defendant was not denied his constitutional right to a speedy trial and that he is not entitled to relief on this basis.

### III. Judicial Diversion Revocation Proceeding

The Defendant contends that the trial court erred by holding a judicial diversion revocation hearing before holding a probation revocation hearing. He relies upon *State v. Brys Andrew Hensley*, No. E2012-00812-CCA-R3-CD, 2013 WL 793579 (Tenn. Crim. App. Mar. 4, 2013), in arguing that the trial court "failed to recognize that revocation of probation and revocation of judicial diversion was a two-step process and required separate exercise of the trial court's discretion in deciding if . . . judicial diversion should be revoked once a violation of probation was found." We interpret the Defendant's contention to mean that the trial court erred in revoking judicial diversion because the court assumed revocation of judicial diversion was required upon finding that the Defendant violated the conditions of his probation. The State responds that the trial court properly found that the Defendant violated the conditions of his probation and properly revoked the Defendant's judicial diversion. We agree with the State.

Tennessee Code Annotated section 40-35-313(a)(1)(A) (2010) (amended 2011, 2012, 2014), states that a trial court "may defer further proceedings against a qualified defendant and place the defendant on probation . . . without entering a judgment of guilty and with the consent of the qualified defendant." The period of deferment "shall be for a period of time . . . not more than the period of the maximum sentence of the felony with which the person is charged." *Id*. Judicial diversion permits a defendant who is adjudicated guilty to "receive an expungement from all official records any recordation relating to arrest, indictment or information, trial, finding of guilty, and dismissal and discharge," upon successfully completing a diversion program. *State v. Schindler*, 986 S.W.2d 209, 211 (Tenn. 1999) (internal quotation marks and citation omitted).

The State may seek to revoke a defendant's judicial diversion by alleging the defendant violated the conditions of the diversionary probation. *Adler v. State*, 108 S.W.3d 263, 266 (Tenn. Crim. App. 2002). Upon an allegation that a defendant has violated the conditions of the probation, "the matter shall proceed under the ordinary procedure for revocation of probation." *State v. Johnson*, 15 S.W.3d 515, 519 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-311 (2014). Upon finding by a preponderance of the evidence that a defendant violated the conditions of the probation, a trial court may revoke the defendant's diversionary probation, enter an adjudication of guilt, and proceed to sentence the defendant pursuant to our sentencing statutes. *Johnson*, 15 S.W.3d at 519; *see* T.C.A. § 40-35-311(e), 40-35-313(a)(2). This court reviews a trial court's decision to revoke probation for an abuse

of discretion, which occurs when "the record contains no substantial evidence to support the conclusion . . . that a violation of probation occurred." *Johnson*, 15 S.W.3d at 517-18 (citing *State v. Gregory*, 946 S.W.2d 829, 832 (Tenn. Crim. App. 1997)).

In *Brys Andrew Hensley*, the defendant received judicial diversion after pleading guilty to reckless aggravated assault. During the diversionary probation period, the defendant was charged with aggravated assault and pleaded guilty to the lesser included offense of assault. The State sought to have the defendant's judicial diversion revoked, and after a hearing, the trial court revoked the defendant's diversion and entered a judgment of conviction for reckless aggravated assault. The trial court stated in denying the defendant's motion to reconsider that pursuant to *State v. Johnson*, "once [the court] determined that the [d]efendant had violated the terms of his judicial diversion, it had no choice but to revoke diversion, enter a judgment of conviction, and impose sentence." *Brys Andrew Hensley*, 2013 WL 793579, at *1. This court concluded that the trial court erroneously determined that it was required to revoked the defendant's judicial diversion upon finding the defendant violated the conditions of his diversionary probation and that Code section 40-35-313(a)(2) "grants the trial court the discretion to revoke diversion upon its finding of a probation violation." *Id.*, at *4.

The Defendant correctly relies upon *Brys Andrew Hensley* for the proposition that a trial court has discretion in determining whether to revoke a defendant's judicial diversion upon finding that the defendant violated a condition of diversionary probation. The record, though, does not reflect that the trial court failed to exercise its discretion or failed to follow the procedure outlined in *Brys Andrew Hensley*. To the contrary, the record reflects that after receiving the uncontradicted testimony of Ms. Linebarger and Ms. Irwin regarding the incident leading to the Defendant's new criminal charges, the court determined that the Defendant violated the conditions of his probation by assaulting Ms. Linebarger. The record, likewise, reflects that the trial court made a distinct determination to revoke the Defendant's judicial diversion. In contrast to *Brys Andrew Hensley*, nothing in the record reflects that the court thought the law required the court to revoke the Defendant's judicial diversion upon determining he violated the conditions of his probation. We note that the trial court discussed the Defendant's "spotty" compliance history, which is supported by the record, and the court's desire to learn about the Defendant's mental health history because it did not believe the Defendant should serve his sentence in confinement. We conclude that the trial court properly exercised its discretion by finding the Defendant violated the conditions of his probation and by revoking the Defendant's judicial diversion. The Defendant is not entitled to relief on this basis.

## IV. Restitution

The Defendant contends that the trial court erred in determining the proper amount of restitution. He argues that the amount of restitution was excessive and not reflective of the victim's pecuniary loss, that the court failed to consider his financial ability to pay, and that it failed to set forth statutorily mandated payment amounts and performance terms in the restitution orders. The State responds that the issue is not properly before the court and, alternatively, that the Defendant failed to prepare an adequate record.

The record reflects that on February 10, 2010, the Defendant pleaded guilty and that the trial court entered a restitution order in the amount of $1485.04, although the order does not state the payment amounts and rate of payments. The plea agreement, however, states that the Defendant agreed to pay $1485.04. On March 24, 2010, when the trial court granted the Defendant's request for judicial diversion, the parties discussed the need for an amended restitution order. The prosecutor noted that the victim impact statement showed the victim received a medical bill for $4731.27, which was unpaid by medical insurance. The prosecutor also stated that the victim required another surgery, and the prosecutor requested an adjustment to the restitution order. The court asked for the amount of the victim's out-of-pocket expenses at the time of the hearing, and the prosecutor said the amount was $1485.04 plus $4731.27. The court requested the prosecutor prepare an order reflecting "that plus any other amounts the Court determines beyond here." The court entered a restitution order on March 3, 2010, for $6216.31 with a handwritten note stating, "Plus, additional surgery – V will provide proof." We note that neither party appealed the restitution order.

The record contains no additional restitution orders, but the 5% fee charged by the trial court clerk's office was $385.07, totaling $8086.42, which was the amount owed according to the July 11, 2012 probation warrant. The subject of restitution, other than the Defendant's failure to make payments, was not addressed again until the July 9, 2014 hearing, at which time defense counsel noted that her records did not support the total amount of restitution. The trial court instructed the prosecutor and counsel to discuss the restitution before the next hearing on September 12, at which time the subsequent trial judge and the subsequent prosecutor were assigned to the case. The subsequent prosecutor argued that the orders were entered in 2010 and that the time to dispute the amount of restitution had expired. The trial court instructed counsel to file a written motion, which was filed on October 20, 2014. The motion was held in abeyance for several months, and the record submitted to this court does not reflect a ruling on the motion. The judgment, filed on December 2, 2014, states relative to restitution to "see order" and that the motion to modify restitution was pending. The special conditions section of the judgment states, "[T]he modification of restitution is to be determined at a future date."

Because the record was incomplete, this court ordered supplementation of the record with all trial court orders, minute entries, and transcripts of hearings related to restitution occurring after December 2, 2014. *See* T.R.A.P. 26(b). The supplemental record reflects that on January 29, 2015, the parties agreed to continue the restitution matter until transcripts of the sentencing hearing could be obtained because defense counsel and the prosecutor were not present at the hearing. On March 26, 2015, the restitution matter was again continued in order to obtain transcripts of previous hearings.

On April 23, 2015, a hearing was held relative to the Defendant's restitution motion. Defense counsel requested the trial court modify the amount of restitution to reflect a reasonable amount based upon the Defendant's financial ability to pay. Counsel requested the court modify the restitution to $1485.04, the amount agreed upon by the parties at the guilty plea hearing. The prosecutor told the court that the second restitution order should have subsumed the first order and that the total restitution amount should have been $6216.31. Counsel argued that any amount more than $1485.04 was inconsistent with the victim's out-of-pocket expenses. The prosecutor maintained the records reflected the victim's out-of-pocket expenses were $6216.31. The court requested counsel and the prosecutor compile the records showing the amount the victim paid, and the court took the matter under advisement.

On May 18, 2015, the trial court entered an order stating the following:

> It appearing to the Court that the victim in this case, Jerry Capps, is now incarcerated within the Tennessee Department of Correction[] with a sentence expiration date of August 2, 2021, and in conjunction with this offender's limited financial ability to pay restitution, it is therefore, ORDERED that the obligation to pay restitution shall be, and is hereby, suspended as a condition of probation pending further order of this Court. The Clerk shall forward a copy of this Order to the defendant's attorney, and to the Knox County District Attorney General.

The record reflects that no additional proceedings were held regarding the restitution. As a result, the record reflects that the trial court relieved the Defendant of paying restitution as a condition of his probation based, in part, on his financial ability to pay restitution.

Generally, our appellate courts will dismiss an appeal as moot "when 'by a court decision, acts of parties, or other causes occurring after the commencement of the action the case has lost its controversial character.'" *West v. Vought Aircraft Industries, Inc.*, 256 S.W.3d 618, 625 (Tenn. 2008) (quoting *McCanless v. Klein*, 188 S.W.2d 745, 747 (Tenn. 1945)). "A case must remain justiciable through the entire course of litigation, including any

appeal." *Alliance for Native American Indian Rights in Tennessee, Inc. v. Nicely*, 182 S.W.3d 333, 338 (Tenn. Ct. App. 2005); *see State v. Ely*, 48 S.W.3d 710, 716 n.3 (Tenn. 2001). A case is moot and not justiciable if it "no longer involves a present, ongoing controversy" and "no longer serves as a means to provide some sort of judicial relief to the prevailing party." *Alliance for Native American Indian Rights in Tennessee, Inc.*, 182 S.W.3d at 338; *see Knott v. Stewart County*, 207 S.W.2d 337, 338-39 (Tenn. 1948).

We conclude that the Defendant's contention regarding restitution is moot because the trial court relieved him of paying restitution as a condition of his probation. As a result, no current and ongoing controversy exists requiring the adjudication of the Defendant's presently existing rights. The restitution issue is moot, and we will not consider it.

We note that although the Defendant was relieved of paying restitution in May 2015, the Defendant's brief was received by this court through the drop box on July 8, 2015, and filed on July 10, 2015. Therefore, the record reflects that defense counsel, who filed the motion to modify the restitution and represented the Defendant at the motion hearing, knew upon receipt of the trial court's May 18, 2015 order that the Defendant was relieved of paying any restitution, rendering moot any trial court error during the imposition of restitution. Nonetheless, counsel raised the restitution issue on appeal, failed to state in the appellate brief that the issue was resolved in the Defendant's favor, failed to advise this court at oral argument of the favorable outcome, and failed to ensure the trial court transcripts and other documents relative to restitution were included in the appellate record. *See* T.R.A.P. 24. We note that the State responded in its brief that either this court lacked jurisdiction to consider the restitution issue because it was unresolved and pending in the trial court or because an inadequate record was presented to this court. At oral argument, counsel failed to respond to the State's brief in this regard and did not inform this court about the favorable resolution of the issue. We caution counsel that our rules of professional responsibility require counsel's candor and prohibit counsel from making misrepresentations or incomplete representations to this court. *See* Tenn. Sup. Ct. R. 8, RPC 3.3, 8.4(c). Compliance with the Rules of Appellate Procedure and the Rules of Professional Conduct is expected of attorneys practicing before this court.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE